## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

**VERNON E. VOYLES,**

       **Plaintiff,**

     **vs.**                                    **Civ. No. 13-1155  JCH/WPL**

**WALGREENS FAMILY OF COMPANIES INCOME PROTECTION PLAN-LTD,[1] and SEDGWICK CLAIMS MANAGEMENT SERVICES,**

       **Defendants.**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on *Plaintiff's Corrected Motion for Judgment on the Record* [Doc. 24], and *Defendants' Corrected Motion for Summary Judgment on the Record* [Doc. 25]  Both parties filed responses [Docs. 30, 36], and replies [Docs. 37, 38].

Having thoroughly reviewed the administrative record, and having carefully considered the motions, briefs, and relevant law, the Court concludes that Plaintiff's motion should be denied and Defendants' motion should be granted.  The Court will grant summary judgment to Defendants.

## BACKGROUND

Plaintiff worked as a store manager for Walgreens until January 12, 2012.  Plaintiff alleged that he became disabled at that time as the result of:  "vascular headaches, hearing loss,

---

[1] Defendants state that the Plan is incorrectly named in the case caption, and that the name should be "Walgreen Disability Income Protection Plan for Store Managers."  [Doc. 25, p. 1 & n.1]

tinnitus, visual loss, confusion, dizziness, loss of motor coordination, problems with attention, memory loss, [and] personality changes."  [Doc. 1, pp. 1-2, ¶ 2]

Walgreens sponsored and funded the Disability Income Protection Benefits for Store Managers ("the Plan").  [Doc. 27-63]  Walgreens was the Plan Administrator, and Sedgwick was the Claim Administrator.  [Doc. 27-63, p. 23]

Plaintiff's claim for short-term disability benefits was denied on January 30, 2012, on the ground that there was no objective evidence in the medical documentation to support restrictions or limitations precluding Plaintiff from performing his job duties.  [Doc. 27-6, pp. 2-3]

**Plaintiff's First Appeal**

Plaintiff appealed the denial on February 7, 2012.  [Doc. 27-6, p. 9]  Plaintiff stated that when his claim was reviewed, documentation from his physician had not yet been received. [Doc. 27-6, p. 9]  Plaintiff submitted a November 2, 2011 brain MRI, which was normal except for evidence of sinus disease.  [Doc. 27-6, p. 16]

Plaintiff also submitted a report by neurologist Dr. Ahmad Sabouni, who evaluated Plaintiff on February 7, 2012, as a follow-up for headaches and Plaintiff's complaints of memory loss.  [Doc. 27-10, p. 12]  The result of the mini-mental state examination ("MMSE") was perfect.  The report noted:  "Mental Status: The patient is awake, alert, and oriented x3.  MMSE 30/30.  Speech is normal.  Stance and Gait:  Normal, patient is able to do the tandem gait without difficulty."  [Doc. 27-10, p. 13]    A March 12, 2012 cervical spine MRI showed normal results. [Doc. 27-40, p. 1]

A review of Plaintiff's medical records was made in April 2012 by Dr. Charles Brock, an MD Board Certified in Neurology and Pain Management.  [Doc. 27-12, p. 8]  Dr. Brock concluded:  "From a neurology perspective the claimant is not disabled from his own occupation

as of January 12, 2012 to return to work." [Doc. 27-12, p. 9]  Dr. Brock noted: "the clinical examination findings demonstrate a normal mini mental status [as] well as normal gait and does not otherwise demonstrate any objective abnormality by neurologic examination." [Doc. 27-12, p. 10]  He further concluded:  "The records do not demonstrate any objective abnormality by neuro-imaging in regards to the claimant's cervical spine or MRI of the brain in support of restrictions/limitations from the claimant's occupation." [Doc. 27-12, p. 10]  Dr. Brock noted that he attempted unsuccessfully, twice, to contact Dr. Sabouni.  [Doc. 27-12, p. 10]  Dr. Brock stated:  "The available medical records do not describe or demonstrate an ongoing severity of frequency of headache with associated signs and/or symptoms in support of a severity that would result in restrictions or limitations from the claimant's occupation." [Doc. 27-12, p. 10]  He concluded:  "There is no indication by neuro-imaging results or by any noted findings on physical examination that would support restrictions or limitations from a neurologic perspective." [Doc. 27-12, p. 11]  And concluded:  "The claimant is not disabled from his own occupation as of January 12, 2012 to return to work." [Doc. 27-12, p. 11]

A second review of Plaintiff's medical records was conducted in April 2012 by Dr. Timothy McManus, Board Certified in Clinical Psychology and Neuropsychology.  [Doc. 27-12, pp. 14-17]  Dr. McManus concluded:  "There was no objective data within the medical record that either substantiated or refuted the presence of functional impairment for the claimant that precluded him from performing his occupation from January 12, 2012 to return to work." [Doc. 27-12, p. 15]  He concluded:  "The imaging studies performed do not support any of the symptoms that were claimed by the claimant." [Doc. 27-12, p. 15]  "The perfect MMSE score obtained by Dr. Sabouni does not support any of the cognitive claims presented by the claimant." [Doc. 27-12, p. 15]  "The claimant's MRI results indicating a widening of the sylvian fissure is

3

not specifically associated with the presence of any functional impairment."  [Doc. 27-12, p. 15]
Dr. McManus attempted to contact Dr. Lambert, but was informed by a secretary that Dr.
Lambert would be willing to forward a copy of his report, but was unwilling to speak with
anyone over the telephone regarding this disability claim; Dr. Lambert's report was not included
within the medical records reviewed on the first appeal by Dr. McManus.  [Doc. 27-12, p. 16]
Dr. McManus concluded:  "The medical imaging reports available were all essentially within
normal limits, and the mild variation observed on the brain MRI does not account for the
claimant's complaints."  [Doc. 27-12, p. 16]  Dr. McManus's opinion was that, "in light of current
information available, there was no objective data that supports the claimant's claim that he was
functionally impaired, disabled, and/or unable to perform his job duties from a
neuropsychological perspective at Walgreens from a period of January 12, 2012 to return to
work."  [Doc. 27-12, p. 16]

On April 20, 2012, Sedgwick upheld the denial of short-term disability benefits,
explaining its decision in a detailed letter.  [Doc. 27-12, p. 19 – Doc. 27-13, p. 2]  Sedgwick
summarized Dr. Brock's review and set forth his conclusion that the treating providers had not
identified any restrictions or limitations, and there were no findings on physical examination that
would support restrictions or limitations from a neurological perspective.  [Doc. 27-13, p. 1]
Sedgwick summarized Dr. McManus's determinations that the medical imaging reports were
essentially within normal limits, and the mild variation observed on the brain MRI did not
account for Plaintiff's complaints; Sedgwick set forth Dr. McManus's conclusion that there were
no objective data supporting Plaintiff's claim of being functionally impaired, disabled, and/or
unable to perform his job duties from a neuropsychological perspective.  [Doc. 27-13, p. 1]
Sedgwick concluded that Plaintiff did not meet the Plan's definition of disability and denied

Plaintiff's claim for benefits.  [Doc. 27-13, p. 1]  The letter informed Plaintiff that he could request a second appeal and could submit additional medical or vocational information, and that he was also entitled to bring a civil action under ERISA.  [Doc. 27-13, pp. 1-2]

### Plaintiff's Second Appeal

Sedgwick granted Plaintiff's request for a second administrative appeal.  [Doc. 27-13, p. 14]  Plaintiff submitted his second appeal on May 21, 2013, with additional documentation. [Doc. 27-13, pp. 16-18; Doc. 27-14, pp. 1-18]

Plaintiff submitted a report by Dr. David B. Durham from an October 25, 2012 neuropsychiatric consultation.  [Doc. 27-14, pp. 1-8]  Dr. Durham reported that:  Plaintiff's affect was congruent with mood, no word finding difficulty was observed, Plaintiff's speed of cognitive processing appeared normal, thought processes were linear with tight associations, reality testing was fully intact, his insight was intact, and his judgment was good.  [Doc. 27-14, pp. 2-3] Informal testing showed some deficits in explicit memory but no overt anterograde or retrograde memory deficits.  [Doc. 27-14, p. 3]  The report stated that Plaintiff's symptoms were "a bit perplexing," because "[o]n their surface one would have to suspect a central neurological lesion," but the 2011 MRI and subsequent neurological testing and labs did not support such a conclusion.  [Doc. 27-14, p. 3]  Dr. Durham assessed Plaintiff with:  Axis I—Mood Disorder, NOS; Memory Loss; Cognitive Disorder, NOS; Axis V—Global Assessment of Functioning ("GAF") score of 62.  [Doc. 27-14, p. 3]  On follow-up visits to Dr. Durham on November 20, 2012, December 20, 2012, and April 12, 2013, the same essentially normal mental status was observed and a GAF of 63 was recorded.  [Doc. 27-14, pp. 4-5, 7]  Dr. Durham again noted that Plaintiff's reported symptoms "remain perplexing."  [Doc. 27-14, pp. 4-5]  The EEG

recommended by Dr. Durham and conducted on December 14, 2012, was normal.  [Doc. 27-14, pp. 9-10]

Plaintiff submitted a report from an evaluation by Dr. Matthew Lambert, a licensed psychologist, on referral from Dr. Sabouni.  [Doc. 27-16, pp. 10-16]  Plaintiff's scores on intellectual functioning were in the high-average to superior range, his learning and memory functioning were average, and his neuropsychological functioning was in the normal range. [Doc. 27-16, pp. 12-14]  Dr. Lambert's report observed that normal or "unremarkable" results were obtained in CT scan of the brain, MRI of the brain, carotid dopplers studies, and a lumbar puncture.  [Doc. 27-16, p. 11]  Dr. Lambert noted that Plaintiff's behavior was normal and pleasant without gross signs of depression or anxiety, expressive and receptive speech were intact, thought content was appropriate, and insight and judgment were good.  [Doc. 27-16, p. 11] Dr. Lambert concluded that Plaintiff's neuropsychological evaluation did not indicate that he was suffering memory dysfunction or a pattern of cerebral dysfunction.  [Doc. 27-16, p. 16] Administration of the MMPI-2 resulted in a valid and interpretable profile, indicating only "a tendency to minimize psychological distress in order to be seen as relatively free of stress and difficulties."  [Doc. 27-16, p. 15]  Dr. Lambert's findings were essentially within normal limits. [Doc. 27-16, pp. 12-16]  Mild deficits with organization and lower than expected attentional abilities were "not reflective of an underlying or progressive process," but were "very mild findings [which] can be seen with the results of poor sleep or effects of chronic pain syndromes, each of which he is reporting."  [Doc. 27-16, p. 16]  Elements of depression could also be playing a role in Plaintiff's complaints.  [Doc. 27-16, p. 16]  Dr. Lambert stated that Plaintiff consumes three or four beers a day.  [Doc. 27-16, p. 11]  Dr. Lambert diagnosed Plaintiff with: "Memory complaints secondary to chronic pain and sleep disruption without objective memory

or neurocognitive dysfunction"; chronic headaches; and depressive disorder NOS.  [Doc. 27-16, p. 16]  Dr. Lambert concluded that there was no indication of the presence of a memory disorder or neurocognitive process, and that it was likely Plaintiff's chronic headaches and sleep dysfunction were the basis for his complaints.  [Doc. 27-16, p. 16]

Plaintiff was given additional time to submit additional records.  [Doc. 27-31, 13, 17-18; Doc. 27-32, pp. 1-2]  Plaintiff submitted his performance evaluations for 2010 to 2011.  [Doc. 27-32, pp. 3-15; Doc. 27-33, pp. 1-5]  The evaluations show generally average to above-average performance on a variety of criteria.

Plaintiff also submitted an August 6, 2013 psychological evaluation by Dr. Baum, a licensed psychologist.  [Doc. 27-33, p. 11]  Dr. Baum, a psychologist, interviewed Plaintiff and conducted an MMPI-2 test.  Dr. Baum's evaluation states that Plaintiff reported major depression at age 20 with visual hallucinations, and on the next page, in part inconsistently states that Plaintiff reported a major depression episode at age 20 with suicidal ideation and auditory hallucinations.  [Doc. 27-33, pp. 12-13]  The evaluation also states that Plaintiff reported a two-year history of depression with visual hallucinations, leading to prescriptions for Prozac and Elavil.  [Doc. 27-33, pp. 12-13]  Plaintiff reported that he was independent in activities of daily life ("ADLs").  [Doc. 27-33, p. 12]  Plaintiff's IQ was estimated as above average and cognitive screening appeared normal; Plaintiff knew presidents past and present, was able to perform "serial 7s," his spelling of WORLD was intact forward and backward, and he was able to recall 2 out of 3 objects and 3 out of 3 after a distractor task.  [Doc. 27-33, p. 13]  The MMPI-2 suggested presence of a major thought disorder and difficulty with reality testing.  [Doc. 27-33, p. 13]  Dr. Baum stated that Plaintiff was experiencing schizoaffective symptoms as identified by the mental status examination (MSE) and MMPI-2; Baum stated that this "pathology is

inconsistent with prior psychiatric evaluations, though no formal clinical psychopathology was previously documented."  [Doc. 27-33, p. 13]  Dr. Baum suggested a lower GAF than other medical evaluators, "in the low 30's as he is experiencing visual hallucinations and all negative signs of schizophrenia." [Doc. 27-33, p. 13]  Dr. Baum suggested a diagnosis of Schizoaffective Disorder, with a need to rule out Major Depression with psychosis.  [Doc. 27-33, p. 13]  Dr. Baum listed Plaintiff's work limitations as:  poor attendance due to stress levels, poor punctuality with deadlines due to stress levels, unlikely to complete work without psychiatric symptom interruption due to hallucinations and mood, and poor capacity to tolerate average workday stress.  [Doc. 27-33, p. 14]  Dr. Baum opined that the clinical and cognitive components of Plaintiff's condition were unlikely to change over the next twelve months, but that antipsychotic medication would be likely to decrease psychotic symptoms.  [Doc. 27-33, p. 14]  Dr. Baum concluded that he did not believe that Plaintiff could perform his job duties "at an acceptable level without severe symptomatology affecting his performance," and concluded that Baum did not believe Plaintiff was "able to perform any substantial gainful activity on a sustained basis." [Doc. 27-33, p. 14]

Dr. Chervinsky, a clinical neuropsychologist, reviewed Plaintiff's medical records and issued a report dated September 23, 2013.  [Doc. 27-34, pp. 9-15; Doc. 27-35, pp. 1-3]  He stated that neurological examination and cognitive screening with the Mini-Mental Status Examination (MMSE) were noted to be unremarkable.  [Doc. 27-34, p. 10]  In addition to clinical examination and cognitive screening, assessment included EEG, MRI of the brain and spine, and lumbar puncture—with results of all assessments being "unremarkable."  [Doc. 27-34, p. 10]

Dr. Chervinsky summarized the results of Dr. Lambert's February 29, 2012 neuropsychological evaluation—observing that recent CT and MRI studies of the brain were

noted to be unremarkable, as were a carotid Doppler and lumbar puncture studies.  [Doc. 27-34, p. 10]  The neuropsychological assessment apparently did not include formal assessment of performance validity, but the findings were "essentially within normal limits, with much of the performance having been quite strong" and it was noted that "all tasks of attention and memory were performed well within normal limits."  [Doc. 27-34, p. 10]  There were no indications of cerebral impairment.  [Doc. 27-34, p. 10]  The MMPI-2 generated valid results, showing a tendency to minimize psychological problems and indicating only "a very mild emotional distress involving depression and even milder anxiety."  [Doc. 27-34, p. 10]

Dr. Chervinsky summarized Dr. Durham's October 12, 2012 neuropsychiatric evaluation and follow-ups.  With the exception of "sub-euthymic" mood, Dr. Durham had reported no observation of difficulties on the examination.  [Doc. 27-34, p. 10]  Diagnoses of Mood Disorder NOS, Memory Loss, and Cognitive Disorder NOS were listed.  There was a report of "deficits in explicit memory" on informal testing, but "no overt anterograde or retrograde memory deficits." [Doc. 27-34, p. 10]

Dr. Chervinsky summarized Dr. Baum's August 6, 2013 psychological evaluation.  [Doc. 27-34, pp. 10-11]  He noted that the history provided in Dr. Baum's report was inconsistent with the information from other sources—with only Dr. Baum's report showing a history of major depression at age 20.  No other records—including Plaintiff's own statement—listed a history of hallucinatory experiences or suicidal thoughts.  [Doc. 27-34, p. 11; Doc. 27-33, pp. 6-9 (Plaintiff's handwritten statement of disability)]  The history recited in Dr. Baum's report was also internally inconsistent, on one page listing a major depression with visual hallucinations at age 20 and on the next page stating that the major depression at age 20 was accompanied by suicidal ideation and auditory hallucinations.  [Doc. 27-34, p. 11]  The MMPI-2 profile included

in Dr. Baum's report reflected the scores of only three of the ten validity scales in current use, and only four of the ten primary clinical scales.  [Doc. 27-34, p. 11]

Dr. Chervinsky included a detailed report of his discussion with Dr. Baum.  Dr. Chervinsky stated that Dr. Baum reportedly evaluated the claimant "on one occasion at an attorney's request and at the attorney's office."[2]   [Doc. 27-34, p. 13]   Dr. Baum referred frequently to his notes, but was often unsure about case information.  Plaintiff was reportedly independent for ADLs, but with "foggy periods."   There was no history of psychiatric hospitalization—and no mental health treatment for the reported episode of major depression at age 20.  Dr. Chervinsky stated:   "Dr. Baum noted the results of cognitive screening were essentially normal." [Doc. 27-34, p. 13]  Two out of three objects were recalled initially, and all three were recalled on a later trial.  "Other findings were described as unremarkable." [Doc. 27-34, p. 13]   The results of the MMPI-2 were reportedly hand-scored and only reflected one significant elevation on Scale 8.  Dr. Baum used only three scales to assess profile validity, noting that he does not routinely examine other MMPI-2 validity scales.  Dr. Baum felt that Plaintiff would not be able to do much with regard to work activities because he could not focus well, with the "basis of difficulties" being Plaintiff's self-report of "problems." [Doc. 27-34, p. 13]   Dr. Chervinsky reported that Dr. Baum noted, however, that "medical and neuropsychological evaluation generated negative findings." [Doc. 27-34, p. 13]  Dr. Baum said he suspected a psychosis that was previously dormant. [Doc. 27-34, p. 13]

Dr. Chervinsky also discussed the case with Dr. Sabouni.  [Doc. 27-34, p. 13]  Plaintiff saw Dr. Sabouni on December 15, 2011, January 2012, February 2012, and March 2012.  The main impairment was reported to be headaches which improved after injection, with no

---

[2] Plaintiff asserts that Dr. Baum interviewed him twice—once by telephone and once in person.  [Doc. 37, p. 5; Doc. 27-33, p. 10]  This difference is not significant.

subsequent information on status. [Doc. 27-34, pp. 13-14] MRI studies, lumbar puncture, and neurological examination were all reported as normal. [Doc. 27-34, p. 14] No issues were noted that would require restrictions or prevent Plaintiff from working. [Doc. 27-34, p. 14] Dr. Sabouni reported that, during the time he saw Plaintiff, he was independent for ADLs and driving, though Plaintiff himself reported that he was not able to work. [Doc. 27-34, p. 14]

Dr. Chervinsky also made several unsuccessful attempts to contact Dr. Black and Dr. Durham. [Doc. 27-34, p. 12] They declined to participate because the release of information had expired. [Doc. 27-34, p. 12]

Dr. Chervinsky's review of the medical records led him to conclude that Plaintiff was not disabled from his own occupation from January 12, 2012 on. [Doc. 27-34, p. 11] Dr. Chervinsky found no objective support for Plaintiff's subjective complaints of headaches and memory problems:

> The clinical findings relevant to the field of clinical neuropsychology reflect normal performance test findings that include a fairly comprehensive neuropsychological assessment.
>
> The claimant's subjective complaints of deficits were not supported from a Neuropsychological perspective.

[Doc. 27-34, p. 11] Dr. Chervinsky provided a comprehensive assessment of the medical records and reports, concluding that the self-reported deficiencies were not supported by objective testing and Plaintiff was not disabled:

> This review is from a Neuropsychological perspective. The claimant is being evaluated for headaches, memory loss and mood disorder.
>
> The claimant is a 55 year old male who works as a Store Manager. This job involves: walking, standing, bending, reaching, climbing ladders, pushing, pulling squatting, kneeling, and lifting/carrying up to 60 pounds frequently/over 60 pounds occasionally. The job description notes this is Heavy level work.

11

Information relevant to the field of clinical neuropsychology reflects a history of self-reported complaints of headaches, cognitive and mood problems.

Objective testing that included screenings by the neurologist as well as a fairly comprehensive neuropsychological assessment were noted to generate normal range findings without indications of neurocognitive dysfunction.

Some mild affective issues were noted, yet these in and of themselves would not preclude adequate functioning.

The most recent psychological evaluation [Dr. Baum's] conducted on referral by the claimant's attorney was notable for lack of cognitive issues, inconsistent report of symptoms not reported by other sources, and incomplete and questionable MMPI-2 results with one moderately significant clinical scale elevation of unclear significance.

Thus, the claimant's self-reported complaints of deficiencies were not supported by objective data.

The claimant was not disabled from his own occupation as of January 12, 2012 – ongoing.

[Doc. 27-34, p. 14]

Four days after Dr. Chervinsky discussed Plaintiff's case with Dr. Baum, Plaintiff's attorney submitted a correction from Dr. Baum.  [Doc. 27-34, p. 6]  Dr. Baum stated that he wished to correct two mistakes in his report:

1) *Correction p. 1  Include italicized words*.
Social History and Daily Functioning:  ADLs are adequate *with prompting*.  He is *not* able to socialize in an average fashion and is not able to drive, or pay bills . . .

2) *Correction p. 2  Delete MMPI-2 paragraph in favor of the following*.
    An MMPI-2 was administered and was valid and *reliable [F(8)-K(18)=10 and L(4)]* producing a bimodal profile of 2/3/1 (T=85) and 7/8/6 (T=77).  The likely diagnosis for 2/3/1 is depression with somatization.  Such claimants are overly controlled with difficult expressing their feelings and instead focus on medical symptoms e.g. decreased concentration, decreased libido, balance and movement problems.  They are passive and dependent in their social relations. Claimants with a 7/8/6 are tense, worried and agitated and prone to obsessive ruminations.  Such claimants have poor social skills and judgment with difficulty forming close adult relations ie., schizoid.  The presence of a thought disorder such as paranoia should be evaluated.   Both profiles suggest chronic

maladjustment, a lack insight and poor self-esteem.   Critical Items:   Somatic
Symptoms 11/23; Depression and Worry 8/16 (Lachar-Wrobel).

The Axis I diagnosis changes from a rule out to a ruling in of *Major
Depression with psychosis*.   The schizoaffective diagnosis then becomes
secondary and needs to be ruled out.

[Doc. 27-34, p. 7 (submitted Sept. 15, 2013)]

Dr. Chervinsky made a second review of Plaintiff's medical records, to consider the
corrections Dr. Baum submitted on September 15, 2013.   [Doc. 27-62, pp. 15-17]   Dr.
Chervinsky noted that Dr. Baum's correction on the MMPI-2 results showed "different, higher
scale elevations than previously reported on the six of the ten MMPI-2 primary scales."   [Doc.
27-62, p. 15]   Dr. Chervinsky stated that his prior review had noted that the MMPI-2 protocol
was incomplete and Dr. Baum provided scoring on only some of the scales; Dr. Baum's
corrections did not state the source of the new information, and did not state that there was any
repeat examination.   [Doc. 27-62, p. 16]   Dr. Chervinsky concluded that the additional
information submitted by Dr. Baum did not alter Chervinsky's previous opinion because Dr.
Baum made changes to his report but the source of the new information was unclear; there was
no mention of any repeat examination or any additional clinical contact.   [Doc. 27-62, p. 16]   Dr.
Chervinsky reaffirmed that his prior review "revealed inconsistencies and incomplete test
administration," and concluded that Dr. Baum's "conclusions regarding this case are not
adequately supported."   [Doc. 27-62, p. 16]   Dr. Chervinsky stated that Dr. Baum's corrections
did not alter his previous opinion; Chervinsky again concluded that Plaintiff was not disabled
from his own occupation as of January 12, 2012.   [Doc. 27-62, p. 16]

On October 25, 2013, Sedgwick upheld the denial of short-term disability benefits.   [Doc.
27-62, pp. 8-10]   The decision included a detailed summary of results from Dr. Baum and Dr.
Sabouni.   Sedgwick observed:   "Dr. Baum noted the results of cognitive screening were

essentially normal," and "medical and neuropsychological evaluation generated negative findings." [Doc. 27-62, p. 9] Sedgwick noted that: Dr. Sabouni reported that Plaintiff's "main impairment was headaches, which improved after injection"; Dr. Sabouni "confirmed the magnetic resonance imaging (MRI) studies, lumbar puncture, and the neurological examination were reported as normal"; and Dr. Sabouni reported to Dr. Chervinsky that "[a]s per the neurological examination there were no issues that would present restrictions from activities or prevent Mr. Voyles from work." [Doc. 27-62, p. 9] Sedgwick concluded that Plaintiff's self-reported complaints were not supported by objective findings, after comprehensive objective testing:

> The available medical [reports] indicated Vernon Voyles was evaluated for headaches, memory loss and mood disorder. However, the clinical findings reflect a history of self-reported complaints of headaches, cognitive and mood problems. The objective testing was fairly comprehensive. The neuropsychological assessment was noted to generate normal range findings without indications of neurocognitive dysfunction. There were some mild affective issues noted, yet these in and of themselves would not preclude adequate functioning.

> The most recent psychological evaluation conducted [by Dr. Baum] noted a lack of cognitive issues, inconsistent reports of symptoms not reported by other sources, and incomplete and questionable MMPI-2 results with one moderately significant clinical scale elevation of unclear significance.

> Mr. Voyles self-reported complaints of deficiencies were not supported by objective findings.

> We received additional information dated September 15, 2013 from Steven K. Baum, PhD. The review of this additional medical documentation did not change the previous opinion and recommendations.

> From a Neuropsychology perspective, there were no clinical findings to support Vernon Voyles' inability to perform in his own occupation as of January 12, 2012.

> It has been determined that Vernon Voyles [does] not meet the Plan's definition of disability. The denial of short-term disability benefits from January 12, 2012 ongoing is upheld.

14

[Doc. 27-62, pp. 9-10]   As quoted above, Sedgwick noted the reasons that Dr. Baum's psychological evaluation did not merit reliance.  The letter stated that Sedgwick's decision was final, and informed Plaintiff that he had the right to file a civil action under ERISA.  [Doc. 27-62, p. 10]

## DISCUSSION

This case arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.  Plaintiff participated in the Walgreen Disability Income Protection Plan for Store Managers ("the Plan").[3]  The Plan Administrator is Walgreens, and the Claim Administrator is Sedgwick Claims Management Services ("Sedgwick").  [Doc. 27-63, p. 23]

Plaintiff, as a beneficiary of the plan, was entitled to bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  Plaintiff contends that Defendants denied him both short-term disability and long-term disability benefits to which he was entitled as a Walgreen's employee.  [Doc. 1]

## I.  Claims Before the Court

The Complaint asserts that Plaintiff is entitled to recovery under ERISA of disability income benefits, alleging that Defendants' denial was unreasonable, arbitrary, and capricious.  [Doc. 1, p. 2, ¶ 4]  The Complaint additionally asserts that Defendants "breached [their] contract and fiduciary obligations to fairly and impartially evaluate the claim of the Plaintiff."  [Doc. 1, p. 2, ¶ 4]  To the extent the Complaint is intended to assert claims in addition to the ERISA claim, such claims are preempted by ERISA and not viable.  *See* 29 U.S.C. § 1144(a) (providing that

---

[3] Defendants note that the Plan is incorrectly named in the case caption as "Walgreens Family of Companies Income Protection Plan-LTD."  [Doc. 25, p. 1 n.1]

ERISA supersedes all state law relating to an employee benefit plan); 29 U.S.C. § 1144(b)(2)(A) (limiting ERISA preemption for laws relating to insurance, banking, or securities); 29 U.S.C. § 1144(b)(2)(B) (providing that an ERISA plan may not be "deemed" to relate to insurance, banking, or securities); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 44-48 (1987) (holding that state law claims for breach of contract or breach of fiduciary duty are preempted by ERISA's comprehensive regulation); *Straub v. W. Union Tel. Co.*, 851 F.2d 1262, 1263-64 (10th Cir. 1988) (broadly construing ERISA preemption and stating that breach of contract claim regarding pension benefits "relates to" an ERISA plan and thus is preempted by ERISA).

The Court concludes that no distinct issue regarding breach of contract or breach of fiduciary duty is before the Court.

The Complaint further asserts that:  Plaintiff "applied for both short term and long term disability insurance benefits"; Plaintiff "is entitled to all benefits payable under the Disability Income Policy"; and requests an award of "all disability income benefits due Plaintiff since January 12, 2012."  [Doc. 1, pp. 1-3]  As Defendants argue, Plaintiff was not able to directly apply for long-term disability benefits, for which an employee becomes eligible only after he has "accumulated a total of 180 days of disability during any consecutive 365-day period" and meets additional requirements.  [Doc. 27-63, pp. 9-10]  Since Plaintiff did not receive any short-term benefits, he could not become entitled to long-term benefits.  In addition, as Defendants argue, there is no record regarding long-term benefits.

The Court concludes that there is no issue presented regarding long-term disability benefits.  The issue before the Court is the propriety of Sedgwick's denial of short-term disability benefits.

## II.  Standard of Review for Denial of Short-Term Disability Benefits

Plaintiff moved for judgment on the record.  [Doc. 24]  Defendants moved for summary judgment on the record.  [Doc. 25]  In an ERISA case, "'summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor.'"  *Cardoza v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1201 (10th Cir. 2013) (quoting *LaAsmar v. Phelps Dodge Corp. Life, Accid'l Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010)).

Defendants argue that the appropriate standard of review is on the arbitrary and capricious standard.  [Doc. 26, p. 9]  Plaintiff argues that the standard is "less than deferential review because of a conflict of interest."  [Doc. 36, p. 6]

### A.  Deferential or de novo review

A denial of benefits under an ERISA plan is reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Eugene S. v. Horizon Blue Cross Blue Shield*, 663 F.3d 1124, 1130 (10th Cir. 2011) (internal quotation marks omitted).  If the plan gives the administrator discretionary authority, review of the administrator's decision is under a deferential standard, with the court "asking only whether the denial of benefits was arbitrary and capricious."  *Id*. (internal quotation marks omitted).  Such review is limited to determining whether the decision was reasonable and made in good faith.  *Id*.  "Certain indicia of an arbitrary and capricious denial of benefits include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary.'"  *Cardoza*, 708 F.3d at 1201-02 (internal quotation marks omitted).  "Substantial evidence is such evidence that a reasonable mind might accept as adequate to

support the conclusion reached by the decisionmaker," and "requires more than a scintilla but less than a preponderance" of evidence. *Id.* (internal quotation marks omitted).

The "default position" is de novo review. *Eugene S.*, 663 F.3d at 1130. The plan administrator bears the burden of showing that review should be under the arbitrary and capricious standard. *Id.* The Tenth Circuit has been "'comparatively liberal in construing language to trigger the more deferential standard of review under ERISA.'" *Id.* at 1132 (quoting *Nance v. Sun Life Assurance Co.*, 294 F.3d 1263, 1268 (10th Cir. 2002)). In *Eugene S.*, the Tenth Circuit determined that the language of the plan—though not explicitly granting discretion—was sufficient to grant Horizon discretion in reviewing benefits claims. The plan in *Eugene S.* granted discretion by stating, e.g., that: "Medically Necessary and Appropriate" services or supplies were limited to those "determined by Horizon" to be such; that payment for benefits were limited to services that "in [Horizon's] judgment, are provided at the proper level of care"; that Horizon "determines what is medically necessary and appropriate." *Eugene S.*, 663 F.3d at 1132. Similar language was sufficient to grant discretion to Magellan, Horizon's delegated third-party plan administrator. *Id.* at 1128, 1133.

The Court reviews the language of the plan to determine whether the administrator has been granted discretion. *Id.* at 1131. In this case, the Court must review the language of the Plan (the "Disability Income Protection Benefits for Store Managers: Summary Plan Description and Plan Document"). [Doc. 27-63, pp. 1-25] This document explicitly states that it constitutes "the Summary Plan Description and Plan Document." [Doc. 27-63, p. 5] *Cf. Eugene S.*, 663 F.3d at 1131-32 (stating that in some cases there is an issue whether Summary Plan Description (SPD) is part of the Plan and concluding it was in that case—relying on SPD's unequivocal statement to that effect).

18

Defendants argue that the Plan gives discretion and that review is therefore under the arbitrary and capricious standard.  [Doc. 26, pp. 9-10; Doc. 38, pp. 1-3]  The Plan provides:

**General Claims/Appeals Information**

. . . .

The Claim Administrator and the Plan Administrator will apply their judgment to claims and appeals in a manner that they deem to be consistent with the Plan and any rules, regulations or prior interpretations of the Plan.   The Claim Administrator and the Plan Administrator will make their decisions in a manner that they believe will apply the Plan consistently to similarly situated participants.

The authority granted to the Claim Administrator and the Plan Administrator to construe and interpret the Plan and make benefit determinations, including claims and appeals determinations, shall be exercised by them (or persons acting under their supervision) <u>as they deem appropriate in their sole discretion</u>.   Benefits under this Plan will be paid or provided to you only if the Claim Administrator or the Plan Administrator, as the case may be, decides <u>in its discretion</u> that you are entitled to them.  All such benefit determinations shall be final and binding on all persons, except to the limited extent to which the Claim Administrator's decisions are subject to further review by the Plan Administrator.

[Doc. 27-63, p. 20 (emphasis added)]

Walgreens is the Plan Administrator, and Sedgwick is the Claim Administrator.  [Doc. 27-63, p. 23]  The Plan gives Sedgwick authority to act as third-party Claim Administrator on behalf of Walgreens.   *See Eugene S.*, 663 F.3d at 1129 (recognizing propriety of such delegation).  Such delegation does not change the applicable standard of review.  *Eugene S.*, 663 F.3d at 1129; *see Geddes v. United Staffing Alliance Emp. Med. Plan*, 469 F.3d 919, 926 (10th Cir. 2006); *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 801 (10th Cir. 2004).  When both the plan administrator and claim administrator are given discretion, the Tenth Circuit concluded that decisions of both are reviewable under the arbitrary and capricious standard.  *Eugene S.*, 663 F.3d at 1132-33.

The Plan language emphasized above unequivocally and unambiguously grants discretion to both Sedgwick and Walgreens in making benefit determinations and in construing the Plan. This language is more than sufficient to grant discretion, under the standard set forth by the Tenth Circuit.  *See Eugene S.*, 663 F.3d at 1132-33.  The Court concludes that Defendants are therefore entitled to deferential review, under the arbitrary and capricious standard.

### B.  Conflict of interest

The next question is whether the Court's review is affected by a conflict of interest. Plaintiff argues that the following points demonstrate a conflict of interest:  Walgreens reserved the right to alter, amend or cancel the Plan; Walgreens paid for the Plan from general assets and a trust; both Walgreens and Sedgwick had discretion regarding claims, appeals, and interpretation of the Plan.  [Doc. 24-1, p. 4]

At one time, a distinction was made between standard conflicts of interest and inherent conflicts of interest (when the same party is both claim administrator and insurer), with the burden placed on the administrator/insurer to prove that its decision was not arbitrary and capricious.  *Hancock v. Metropolitan Life In. Co.*, 590 F.3d 1141, 1155 (10th Cir. 2009); *see Fought v. UNUM Life Ins. Co.*, 379 F.3d 997, 1004 (10th Cir. 2004) (per curiam), *abrogated by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115-16 (2008).  After the Supreme Court rejected such burden-shifting rules, any conflict of interest is "but one factor among many that a reviewing judge must take into account."  *Glenn*, 554 U.S. at 116.  A number of "different, often case-specific factors" must be considered, with the result reached by "weighing all together."  *Id.* at 117.  A "combination-of-factors method of review" is required:

> In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest

> at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.  It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Glenn*, 554 U.S. at 117.  A conflict of interest "affects the outcome at the margin, when [the court] waver[s] between affirmance and reversal." *Hancock*, 590 F.3d at 1155.

If there is a conflict of interest, the Court "must weigh the conflict as a factor in determining whether there is an abuse of discretion, according it more or less weight depending on its seriousness." *Cardoza*, 708 F.3d at 1202.  "The seriousness of a conflict of interest is 'proportionate to the likelihood that the conflict affected the benefits decision.'" *Cardoza*, 708 F.3d at 1202 (quoting *Graham v. Hartford Life & Accid.. Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009)).  "A conflict is more important when circumstances suggest a higher likelihood that it affected the benefits decision, but less so when the conflicted party has taken active steps to reduce potential bias and to promote accuracy." *Cardoza*, 708 F.3d at 1202 (internal quotation marks omitted); *see Glenn*, 554 U.S. at 117-18; *Hancock*, 590 F.3d at 1155.

The hiring of independent reviewers "actually *decreases* the importance of a plan administrator's inherent conflict of interest because they are not employed by the administrator." *Rizzi v. Hartford Life & Accid. Ins. Co.*, 383 Fed. Appx 738, 750 (10th Cir. 2010) (unpublished),[4] *aff'g* 613 F. Supp. 2d 1234 (D.N.M. 2009).  In this case, Sedgwick had Plaintiff's medical file reviewed by three independent reviewers.  This factor reduces the weight of any conflict of interest.

---

[4] The Court cites this and other unpublished opinions for their persuasive value.  *See* 10th Cir. R. 32.1(A).

Walgreens took some "active steps to reduce potential bias" by delegating discretion to Sedgwick to decide claims.  *See Cardoza*, 708 F.3d at 1202-03 (according "little weight" to conflict, when claims analysts were separated from financial information and not paid any incentive compensation based on their payment or denial of claims).  Defendants argue that Walgreens in fact took no part in the decisions on Plaintiff's claim, and that the record indicates that there was in fact no review of Plaintiff's claim by Walgreens (despite the Plan's provision allowing such review).  [Doc. 38, pp. 1-2]  The decision letters denying Plaintiff benefits were issued only by Sedgwick.

The Court notes, however, that the Plan provides for review of Sedgwick's decisions by Walgreens, under certain circumstances:

**Potential Review of Appeal by the Plan Administrator**

If either the Plan Administrator or the Claim Administrator determines that the appeal presents material issues that are outside the expertise or purview of the Claim Administrator (such as hours worked, employment status or new or unique procedural or Plan interpretation issues), then the Claim Administrator's decisions will be subject to further review by the Plan Administrator.  You will be notified if such a further review will be performed.  Unless you are instructed that additional information is needed for this review, you will not be required to submit any further information to the Plan Administrator (although you may do so if you wish).  The Plan Administrator's decision will be based on all information submitted by you and any other information that the Plan Administrator considers relevant.

[Doc. 27-63, pp. 19-20]  This provision limits the possibility of further review by Walgreens to specified circumstances.  There is no indication in this record that these circumstances were present or that any such further review took place; however, it is not clear to the Court that Walgreens' retention of a possible role in the ultimate decision makes no difference.  The Court is concerned that a non-exclusive delegation of authority, together with retention of the ability for further review, might undermine the principles involved.  A plan administrator could sit back

22

and allow the claims administrator to make benefits determinations when the plan administrator agreed with the result reached, but the plan administrator could potentially intervene and subject the determination to further review when disagreeing with the result reached.

Defendants cite caselaw in support of their argument that there is no conflict of interest, because the Plan delegates to Sedgwick discretionary authority to determine eligibility for benefits and to interpret the Plan.   [Doc. 30, pp. 3-4]  But cases cited by Defendants are not entirely persuasive.

In *Eugene S.*, the Tenth Circuit rejected the argument that there was a conflict of interest when both Horizon and Magellan were given discretion to decide claims, but the argument there was that the plan administrator had a conflict of interest because there was pressure to keep claim payments low in order to successfully compete with other insurers; the Tenth Circuit held that assertion of "a generalized economic incentive" was insufficient to show a conflict of interest. *Eugene S.*, 663 F.3d at 1133.  This is not the same argument raised in the case before the Court, and *Eugene S.* did not involve the impact of a potential for further review of one administrator's decisions by the other.

In *Atkins*, another case cited by Defendants, the Tenth Circuit concluded that there was no conflict of interest and the "pure" arbitrary and capricious standard applied,[5] because the plan administrator delegated "full <u>and exclusive</u> authority and discretion" to Sedgwick to make "final and conclusive" decisions on claims.  *Atkins v. SBC Communc'ns, Inc.*, 200 Fed. Appx. 766, 770-71 (10th Cir. 2006) (emphasis added).  Similarly, in *Finley* the Tenth Circuit determined that the plan administrator avoided a conflict by employing an independent third-party claims administrator; although the terms of the plan are not set forth in detail, it appears that there was

---

[5] Before *Glenn*, the Tenth Circuit applied either the "pure" or "sliding scale" approach, decreasing the level of deference in proportion to the seriousness of a conflict, under *Fought v. UNUM Life Ins. Co.*, 379 F.3d 997, 1003 (10th Cir. 2004).  *Fought* was abrogated on this point by the Supreme Court in *Glenn*, 554 U.S. at 115-16.

again a complete delegation of discretion to the third party.  *Finley v. Hewlett-Packard Co. Emp. Benefits Org. Income Protection Plan*, 379 F.3d 1168, 1176 (10th Cir. 2004).  Neither *Atkins* nor *Finley* involves a plan like the one before the Court, in which Walgreens retained discretion to decide some claims rather than delegating exclusive authority, and in which Walgreens also retained the ability for further review under some circumstances; therefore, these cases do not support Defendants' argument that there was no conflict of interest.

Defendants also cite *Oates*, in which the Eleventh Circuit addressed the same—or a similar—plan, also involving Walgreens and Sedgwick.  *Oates v. Walgreen Co.*, 573 Fed Appx. 897 (11th Cir. 2014) (per curiam) (unpublished).  [Doc. 38, p. 2]  The Eleventh Circuit stated that Walgreens' potential power to reverse Sedgwick's decisions upon further review did not indicate that Walgreens has the power to reverse Sedgwick's "factual determinations with respect to Oates's condition and transferable skills"—which were the only determinations challenged on appeal.  *Id*. at 908.  In contrast, Plaintiff's challenge in the case before the Court is to Sedgwick's ultimate determination on disability.  In addition, the Eleventh Circuit alternatively held that, to the extent that Walgreens' limited power of review did create a conflict of interest, the conflict of interest was not significant enough to render Sedgwick's decision arbitrary and capricious in light of other factors—including the lack of any indication in the record before the Eleventh Circuit that Walgreens in fact directly influenced Sedgwick's determination.  *Id*.  The Eleventh Circuit also noted that additional evidence had been presented in that record (not present in the record before this Court) indicating that Walgreens performed only a limited role.  *Id*. at 908-09.

As an unpublished and per curiam decision—on alternative grounds—from the Eleventh Circuit, *Oates* does not provide persuasive authority for this Court.  The Court does agree generally with the approach of *Oates*.  In Plaintiff's case, as in *Oates*, Plaintiff cites nothing in

the record to show that Walgreens in fact took any role in the decisions at issue, or that any circumstances suggested a likelihood that Walgreens' limited power of review affected Sedgwick's decision on Plaintiff's benefits. *See Glenn*, 554 U.S. at 117 (stating that a conflict of interest "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision"). Nor does Plaintiff argue that the limited circumstances under which Walgreens had the potential for further review in fact arose in Plaintiff's case.

Upon the record presented in Plaintiff's case, the Court concludes that it need not resolve whether there is any conflict of interest in this case. Assuming arguendo that there is a conflict of interest under the Plan, and considering the record before the Court and all of the relevant circumstances, the Court concludes that any conflict is a factor to consider but is of "little weight" in this particular case. *See Cardoza*, 708 F.3d at 1202-03. Walgreens did take some active steps to reduce potential bias by delegating discretion to Sedgwick (though decisionmaking authority was shared), and there are no particular circumstances in Plaintiff's case suggesting a likelihood that any conflict affected Sedgwick's decision. *See Cardoza*, 708 F.3d at 1202. In addition, as discussed in detail below, the Court concludes that there was ample support in the record for Sedgwick's decision to deny benefits—with Dr. Baum's gravely discredited opinion providing the only significant support in favor of short-term disability, and ample reliable evidence to the contrary. A conflict of interest "affects the outcome at the margin, when [the court] waver[s] between affirmance and reversal." *Hancock*, 590 F.3d at 1155. This is not a close case, in which a conflict of interest would be a "tiebreaker"; the other factors are not "closely balanced," and the Court is not wavering between affirmance and reversal. *Glenn*, 554 U.S. at 117. Even if the Court considers a conflict of interest as a factor, that would not

change the Court's decision that Sedgwick's decision to deny Plaintiff short-term disability benefits was not arbitrary and capricious.

### C.  Deference to Treating Physicians

Plaintiff argues that the opinions of Dr. Brock and Dr. McManus "should be given no weight" because these doctors reviewed the medical file rather than personally examining Plaintiff.  [Doc. 36, p. 9]  Plaintiff argues that the "only medical evaluator whose opinions should be given any weight is Dr. Baum and the Defendants' refusal to do so is a factor establishing an abuse of discretion."  [Doc. 36, p. 10]  Defendants respond that a claim administrator is not required to adopt a treating physician's opinion.  [Doc. 38, p. 8]

The Court rejects both facets of Plaintiff's argument.  The Tenth Circuit stated that it was bound to follow the "clear holding" of the Supreme Court, which rejected any rule requiring special deference to a treating physician's opinion:

> "[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."

*Eugene S.*, 663 F.3d at 1135 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)).  ERISA "does not require plan 'administrators automatically to accord special weight to the opinions of a claimant's physician[s].'"  *Menge v. AT & T*, 595 Fed. Appx. 811, 815 (10th Cir. 2014) (unpublished) (quoting *Nord*, 538 U.S. at 834).  "Indeed, plan administrators may, without explanation, 'credit reliable evidence that conflicts with a treating physician's evaluation.'"  *Id.* (quoting *Nord*, 538 U.S. at 834); *see Eissa v. Aetna Life Ins. Co.*, 479 Fed. Appx. 845, 852 (10th Cir. 2012) (unpublished) (observing that the Supreme Court concluded in *Nord*, 538 U.S. at 831,

that ERISA does not impose a heightened burden of explanation on an administrator who rejects a treating physician's opinion).

As these holdings demonstrate, the corollary of the rule that special deference is not given to a treating physician's opinion is that an administrator may rely on the opinions of reviewing (i.e., non-treating) medical specialists when the administrator finds those opinions reliable, even when reviewing specialists' opinions conflict with a treating physician's opinion. *See Rizzi*, 383 Fed. Appx. at 750-51, 756-57 (affirming denial of benefits when treating physician concluded plaintiff was disabled, but reviewing medical specialists concluded plaintiff was not disabled); *Atkins*, 200 Fed. Appx. at 773 (affirming denial of benefits when Sedgwick credited opinions of reviewing doctors instead of opinions of treating specialists).  It was not unreasonable for Sedgwick to rely on opinions by reviewing, non-treating medical specialists if Sedgwick found those opinions reliable.

## III.  Denial of Short-Term Disability Benefits

The Plan defines short-term disability as follows:

> For the short-term disability period, "disabled" or "disability" means that, due to illness, pregnancy or injury, you are receiving appropriate care and treatment from a doctor on a continuing basis and you are prevented by your condition from performing one or more of the essential duties of your Company occupation.

[Doc. 27-63, p. 9][6]  Sedgwick, following the claims process and two appeals, notified Plaintiff of its decision to deny Plaintiff's claim for short-term disability benefits in a letter dated October 25, 2013.  [Doc. 27-62, pp. 8-10]  This letter contains a detailed summary of the evidence on which the decision was based.

---

[6] Plaintiff argues that Sedgwick's January 30, 2012 denial of Plaintiff's claim recited an incorrect definition for short-term benefits.  [Doc. 36, pp. 11-12]  But Sedgwick's final decision on October 25, 2013, after the second appeal, sets forth the correct definition.  [Doc. 27-62, p. 8]  Any error in an earlier Sedgwick letter decision is insignificant.

Using the arbitrary and capricious standard, the Court must determine whether Sedgwick's decision was reasonable and made in good faith. *See Eugene S.*, 663 F.3d at 1134. The Court looks for substantial evidence in the record to support the decision, which requires "more than a scintilla of evidence that a reasonable mind could accept as sufficient" to support the decision to deny benefits. *Id.* at 1135 (internal quotation marks omitted).

Plaintiff complained of headaches, memory loss, mood disorder—and, in addition, of extreme fatigue, hearing and vision problems, balance problems, and loss of sleep. Plaintiff submitted a handwritten statement that he became unable to do his job in January 2012. [Doc. 27-33, pp. 6-9]

Plaintiff's treating neurologist, Dr. Sabouni, noted Plaintiff's mental status was normal and his MMSE was a perfect 30/30; in addition, a cervical spine MRI showed normal results. [Doc. 27-10, p. 13; Doc. 27-40, p. 1]  Plaintiff's treating specialist, Dr. Lambert, noted that normal results were obtained from administration of the MMPI-2, and also from:  a CT brain scan, an MRI, carotid dopplers studies, and a lumbar puncture; he concluded that test results did not indicate impairment of memory, cerebral dysfunction, or neurocognitive process.  [Doc. 27-16, p. 11-16]  Dr. Lambert did not conclude that Plaintiff was disabled, instead concluding that there were depressive symptoms and "very mild" findings of organizational deficit and attentional abilities—which "are not reflective of an underlying or progressive process," but which "can be seen with the results of poor sleep or effects of chronic pain syndromes, each of which [Plaintiff] is reporting." [Doc. 27-16, p. 16]  Plaintiff was evaluated by Dr. Durham, who reported that the MRI and subsequent neurological testing and labs did not support Plaintiff's claimed symptoms.  Dr. Durham reported that he was "a bit perplexed" about any cause for those symptoms; the cognitive evaluation, MRI, subsequent neurological testing and labs, and EEG all

yielded normal results—with only "sub-euthymic" mood and some deficits in explicit memory but no overt anterograde or retrograde memory deficits.  [Doc. 27-14, pp. 2-10]  Thus no objective evidence supported the complaints.  Dr. Durham did not conclude that Plaintiff was disabled.

The only significant support for Plaintiff's claim of disability came from Dr. Baum, Plaintiff's treating psychologist.  After a psychological evaluation, Dr. Baum concluded that Plaintiff was unable to perform his job duties at an acceptable level and was unable "to perform any substantial gainful activity on a sustained basis." [Doc. 27-33, p. 14]

Three reviewing medical specialists determined that there was no evidence of neurological or neuropsychological impairment that would prevent Plaintiff from performing his job as a store manager.  Dr. Brock and Dr. McManus reviewed Plaintiff's medical file during the first appeal; their findings and conclusions are set forth in greater detail in the "Background" section above.   Dr. Brock concluded that Plaintiff was not disabled from a neurology perspective, and clinical examination findings were normal and did not demonstrate any objective abnormality; Dr. Brock concluded that the medical records did not show a severity or frequency of headaches that would support restrictions or limitations from a neurologic perspective.  [Doc. 27-12, pp. 9-11]  Dr. McManus concluded that:  there was no objective data substantiating the presence of functional impairment that would have precluded Plaintiff from performing his job; the imaging studies did not support any of the symptoms reported by Plaintiff; the perfect MMSE score obtained by Dr. Sabouni did not support any of the cognitive claims made by Plaintiff; and no objective data supported Plaintiff's claim that he was functionally impaired, disabled, or unable to perform his job duties from a neurological perspective.  [Doc. 27-12, pp. 15-16]

On the second appeal, Dr. Chervinsky reviewed the entire medical file, including Dr. Baum's psychological evaluation and the September 15, 2013 corrections to Dr. Baum's report. An administrator is not required to provide an explanation for rejecting a treating doctor's evaluation and instead crediting reliable evidence from other sources.  *See Nord*, 538 U.S. at 834 (stating that courts may not impose a burden on administrator to explain why they credit reliable evidence that conflicts with treating physician's evaluation); *Menge*, 595 Fed. Appx. at 815 (stating that administrators may, without explanation, rely on reliable evidence that conflicts with treating physician's evaluation); *Eissa*, 479 Fed. Appx. at 852 (observing that the Supreme Court concluded in *Nord*, 438 U.S. at 831, that ERISA does not impose heightened burden of explanation on an administrator who rejects a treating physician's opinion).

Although not required to do so, Sedgwick provided reasons for rejecting the opinion of Plaintiff's treating psychologist, Dr. Baum, that Plaintiff was disabled.  Dr. Chervinsky noted that Dr. Baum's report was internally inconsistent in its report of the symptoms accompanying an otherwise unreported and untreated episode of major depression when Plaintiff was twenty years old.  [Doc. 27-34, pp. 10-11]  Dr. Chervinsky explained that Dr. Baum's MMPI-2 profile was deficient because it failed to use seven of ten validity scales, and failed to use six of the ten primary clinical scales.  [Doc. 27-34, p. 11]  Sedgwick's decision stated that Dr. Baum's psychological evaluation: noted a "lack of cognitive issues"; included an "inconsistent report of symptoms not reported by other sources"; and included "incomplete and questionable MMPI-2 results" which merely showed "one moderately significant clinical scale elevation of unclear significance."  [Doc. 27-62, p. 9]  Sedgwick's decision letter further stated that Dr. Baum's September 15, 2013 corrections to his report did not change Dr. Chervinsky's opinion.  [Doc. 27-62, p. 10]  As Dr. Chervinsky explained, Dr. Baum provided no source for the altered

information and no explanation of the reason for the changes; there was no mention of a repeat examination or an additional clinical contact.  [Doc. 27-62, pp. 15-16]  Yet Dr. Baum reported different, higher scale elevations on six of the ten MMPI-2 primary scales, and changed the diagnosis.  [Doc. 27-62, p. 15]  Dr. Chervinsky thus reaffirmed his prior opinion that Dr. Baum's report contained inconsistencies, incomplete and questionable test administration, and lack of support for the conclusions given.  [Doc. 27-62, p. 16]  In fact, Dr. Baum's unexplained and unsubstantiated "corrections" to his report provide additional reason that it was not unreasonable for Sedgwick to reject Dr. Baum's opinions; Sedgwick could reasonably conclude that such changes further undermine the confidence merited by Dr. Baum's opinion.

There was also specific evidence contrary to Dr. Baum's report.  First, Dr. Lambert had also administered the MMPI-2, obtaining results showing only "a tendency to minimize psychological distress" and "a very mild level of emotional distress involving depression and an even milder level of anxiety"; Dr. Lambert did not conclude that Plaintiff was disabled, but instead that "neuropsychological evaluation does not indicate he is suffering memory dysfunction or a pattern of cerebral dysfunction," and that Plaintiff's complaints could be the result of poor sleep or chronic pain syndrome, and possible "elements of depression."  [Doc. 27-16, pp. 12-16]  Given the deficiencies observed in Dr. Baum's MMPI-2 results, Dr. Chervinsky and Sedgwick could reasonably credit Dr. Lambert's MMPI-2 results and opinion instead.  The Court concludes that Sedgwick could reasonably reject Dr. Baum's opinion as unreliable and unsupported.  Second, Dr. Durham reported, from his neuropsychiatric evaluation of Plaintiff, GAFs of 62 and 63.  [Doc. 27-14, pp. 3, 7]  Dr. Baum reported a much lower GAF, in the "low 30's."  [Doc. 27-33, p. 13]  Sedgwick could reasonably rely on Dr. Durham's evaluation instead

of Dr. Baum's on this point, finding Dr. Durham's evaluation reliable and concluding that the differences further undermined the reliability of Dr. Baum's opinion.

The Court further concludes that Sedgwick could reasonably expect "some supporting evidence to buttress" Plaintiff's claim of disability, rather than deferring solely to Plaintiff's subjective reports of problems. *See Rizzi*, 383 Fed. Appx. at 752-53. In *Rizzi*, the Tenth Circuit upheld the denial of disability benefits, quoting with approval statements from a Ninth Circuit case observing that a person's reports of pain cannot be unchallengeable, because that would "'shift the discretion from the administrator, as the plan requires, to the physicians chosen by the applicant, who depend for their diagnoses on the applicant's reports to them of pain.'" *Id.* at 752 (quoting *Jordan v. Northrup Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 878 (9th Cir. 2004), *overruled on other grounds by Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 969 (9th Cir. 2006) (en banc)). The Tenth Circuit stated that the lack of any tangible evidence of the plaintiff's complaints was important; objective medical testing revealed no cause for her condition or confirmation of her limitations. *Id.* In *Rizzi*, there was surveillance evidence showing the plaintiff functioning without visible signs of disabling pain. *Id.* at 753. The plaintiff provided no tangible support for her claim—no neurological study, no additional tests, and no supporting documentation of witnesses to her physical limitations. *Id.* Affirming the denial of benefits, the Tenth Circuit stated: "A plan administrator need not ignore reliable medical evidence in deference to subjective reports; nor is it unreasonable to expect some supporting evidence to buttress a claim of disability." *Id.*; *see Meraou v. Williams Co. Long Term Disability Plan*, 221 Fed. Appx. 696, 705-06 (10th Cir. 2007) (unpublished) (affirming denial of benefits when plaintiff's subjective complaints of pain were not corroborated by medical evidence establishing that her fibromyalgia was disabling); *Frizzell v. Shalala*, 37 F.3d

1509, *1-3 (10th Cir. 1994) (unpublished) (affirming denial of benefits when there was no objective corroboration of subjective complaints and plaintiff's doctors did not state plaintiff's fibromyalgia was disabling; X-ray, CT brain scan, MRI all were normal).

As in these cases, it was not unreasonable for Sedgwick to rely on the opinions of medical specialists which were supported by the medical and neurological evidence showing normal and "unremarkable" results:  the MRIs of the brain and spine, CT scan, EEG, lumbar puncture, carotid doppler, Dr. Sabouni's MMSE showing perfect results, Dr. Sabouni's MMPI-2 testing, and other neurological testing and labs (summarized in greater detail in the "Background" section, above).  Except for Dr. Baum, the other treating and reviewing medical specialists did not conclude that Plaintiff suffered from limitations preventing him from performing his job.  Except for Dr. Baum, other treating and reviewing medical specialists did not conclude that Plaintiff was disabled.

An administrator may—even without explanation—"'credit reliable evidence that conflicts with a treating physician's evaluation.'"  *Menge*, 595 Fed. Appx. at 815 (quoting *Nord*, 538 U.S. at 834).  An administrator's decision "need not 'be the only logical one or even the superlative one,'" as long as there is substantial evidence in the record to support the decision. *Eugene S.*, 663 F.3d at 1135 (quoting *Adamson v. UNUM Life Ins. Co.*, 455 F.3d 1209, 1212 (10th Cir. 2006)).  As long as an administrator's decision "'falls somewhere on a continuum of reasonableness—even if on the low end'"—a court should not disturb it.  *Nance*, 294 F.3d at 1269 (quoting *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999)).   An administrator's decision should be upheld "'unless it is not grounded on *any* reasonable basis.'" *Id.* (quoting *Kimber*, 196 F.3d at 1098).

As explained above, there was a reasonable basis for Sedgwick not to credit Dr. Baum's opinion. *See id*. Sedgwick's decision to rely on the opinions of the other medical specialists, who did not find Plaintiff disabled, was not unreasonable. The Court concludes that there was substantial evidence in the record to support Sedgwick's decision, and the decision to deny short-term disability benefits was not arbitrary and capricious.[7]

Plaintiff makes a number of arguments against this conclusion.

First, Plaintiff argues that the opinions of Dr. Brock and Dr. McManus should be given no weight because they did not review Dr. Lambert's report, which was not provided in time. [Doc. 36, p. 9; Doc. 38, p. 7; Doc. 27-12, pp. 16, 11-12] Plaintiff also argues that unsuccessful attempts to speak with Dr. Lambert show that the opinions of Dr. Brock and Dr. McManus lacked support. Dr. Brock was unable to speak with Dr. Sabouni, despite two attempts. [Doc. 36, p. 9; Doc. 27-12, p. 10] Dr. McManus was unable to speak with Dr. Lambert, because Lambert advised through his secretary that he was unwilling to speak about the claim on the telephone. [Doc. 27-12, p. 16]

Defendants respond that Drs. Brock and McManus gave opinions which were consistent with the evidence in the record on the first appeal, which showed no objective evidence of functional impairment. [Doc. 38, p. 7] Defendants point out that Plaintiff was allowed a second appeal, not required under the Plan or ERISA—in which Dr. Lambert's report and other evidence were reviewed. [Doc. 38, p. 7]

The Court notes that Dr. Lambert's report showed essentially normal findings and did not conclude that Plaintiff was disabled. [Doc. 27-16, pp. 11-18] In addition, Plaintiff does not show that reviewing Dr. Lambert's report or speaking to Dr. Sabouni or Dr. Lambert would have

---

[7] Defendants also argue that Sedgwick is not a proper defendant. [Doc. 26, p. 24] In view of the Court's conclusion, the Court need not reach this issue.

provided different information and led to different opinions than resulted from Dr. Brock's and Dr. McManus's review of the available medical records.  The Tenth Circuit rejected a similar challenge, when the plaintiff failed to show that different information or a different result would have been obtained if independent reviewing physicians had been able to teleconference with treating doctors.  *See Menge*, 595 Fed. Appx. at 815.  As in *Menge*, the Court concludes that Plaintiff failed to show that it would have made a difference to the opinions of Drs. Brock and McManus if they had access to some additional information.  In addition, "a plan administrator may reasonably rely on the opinions of its own doctors who have reviewed the claimant's medical file but not consulted with the claimant's treating physicians."  *Id.* (citing *Davis v. Unum Life Ins. Co.*, 444 F.3d 569, 577 (7th Cir. 2006)).

Second, Plaintiff argues that only Dr. Baum was given the correct job description and that others were given the following incorrect job description:  "Job:  Store Mgr; Walking, Standing, Bending, Reaching, Climbing Ladder, Pushing, Pulling, Squatting, Kneeling; Lift/Carry Up to 60 Lbs Freq., Over 60 Lbs Occas. Heavy Work."  [Doc. 36, pp. 1-10; Doc. 27-38, p. 8; Doc. 24-1, pp. 2, 5, 10]   Dr. Brock and Dr. Chervinsky do recite this job description.  [Doc. 27-12, p. 9; Doc. 27-34, pp. 9, 14; Doc. 27-62, p. 15]  Plaintiff argues that Sedgwick should have obtained and reviewed Plaintiff's personnel file and performance evaluations to determine Plaintiff's job duties.  [Doc. 36, pp. 7-8; Doc. 37, p. 6; Doc. 24-1, pp. 10-11]  Defendants respond that the record shows that Dr. Chervinsky and Sedgwick did have the performance evaluations on the second appeal.  [Doc. 38, p. 4; Doc. 30, p. 7; Doc. 27-35, p. 2 (showing that Dr. Chervinsky had Plaintiff's 2010-2011 performance reviews)]  Plaintiff does not cite to the record to support his assertions that Dr. Baum was given the correct job description, or that others (including treating specialists, Dr. Sabouni and Dr. Durham, and reviewing physician Dr. McManus) were not.

The Court concludes, however, that even if the record fully supported Plaintiff's argument that only Dr. Baum had the correct job description, such a showing would not demonstrate that Sedgwick's decision was arbitrary and capricious.  Dr. Baum's opinion was seriously discredited by Dr. Chervinsky and Sedgwick, and none of the other treating or reviewing specialists concluded that Plaintiff was disabled.  In addition, the record does show that Dr. Chervinsky was presented with Plaintiff's performance reviews, which show a correct job description.  [Doc. 27-35, p. 2; Doc. 27-32, p. 3 to Doc. 27-33, p. 5]  Further, Dr. Chervinsky's report specifically acknowledged Plaintiff's additional job duties in addition to the "heavy level work":  "The claimant reported that his problems resulted in his inability to focus and concentrate on his job duties particularly with regard to analyzing business statements and reports, making effective action plans, performing physical aspects of his job, and training others."  [Doc. 27-34, p. 9 (emphasis added)]  And Plaintiff's own handwritten statement sets forth his physical duties and emphasizes that his job is not an office "desk" job—stating that he "would spend hours every day unloading trucks, stocking shelves, merchandising displays and [on] various duties requiring physical work."  [Doc. 27-33, p. 6]  Plaintiff explained that any physical activity exacerbated his headaches so that he was required to be sedentary for a few hours, and that any "strenuous activity like lifting or repeated bending" caused the headache to increase to the feeling of an icepick being jabbed into his head.  [Doc. 27-33, p. 6]  Given this, it was not entirely unreasonable for reviewers to recite the "heavy level work" job description.  But most important, the evaluations and reports did in fact focus on neurological issues and still no one but Dr. Baum concluded that Plaintiff was disabled; it does not matter what Plaintiff's job description was, because no limitations or restrictions were set forth except in Dr. Baum's report.

Without reliable objective evidence to support Plaintiff's subjective complaints, the job description was not critical.

## **CONCLUSION**

Sedgwick's decision to deny benefits need not be the most logical decision available, as long as the decision "'falls somewhere on a continuum of reasonableness—even if on the low end.'" *Menge*, 595 Fed. Appx. at 816 (quoting *Nance*, 294 F.3d at 1269). The Court's role is not to referee a battle of differing experts or to decide whether the decision to deny benefits was "correct," but instead to determine whether Sedgwick reasonably exercised its discretion and its decision is supported by substantial evidence. *Rizzi*, 613 F. Supp. 2d at 1249.

The Court concludes that Sedgwick's decision to deny short-term disability benefits was not arbitrary and capricious. There is substantial evidence in the record to support the decision; there is no objective evidence in the record that Sedgwick found reliable, despite comprehensive testing and evaluations, to support Plaintiff's subjective complaints. It was not unreasonable for Sedgwick to rely on the opinions of medical specialists which were supported by the medical and neurological evidence showing normal and "unremarkable" results, and to conclude that Plaintiff was not disabled.

The Court grants summary judgment to Defendants.

**IT IS THEREFORE ORDERED** that:

(1) *Plaintiff's Corrected Motion for Judgment on the Record* [Doc. 24] is **DENIED**, and

(2) *Defendants' Corrected Motion for Summary Judgment on the Record* [Doc. 25] is

**GRANTED**.

_____

**UNITED STATES DISTRICT JUDGE**